Lawrence LEYBA, Plaintiff,

v.

Hartmut RENGER, Anesthesia Specialists of Albuquerque, a New Mexico partnership and St. Joseph's Healthcare Corp., a New Mexico corporation, Defendants.

No. CIV 90–0252 LH/LFG.

United States District Court,
D. New Mexico.

May 18, 1994.

Joseph Goldberg, Raymond G. Sanchez, Freedman, Boyd, Daniels, Peifer, Hollander, Guttmann & Goldberg, Albuquerque, NM, for plaintiff.

Peter H. Johnstone, Thomas C. Bird, Russell Moore, Keleher & McLeod, P.A., Nicholas Pica, Campbell, Pica, Olson & Seegmiller, Albuquerque, NM, for defendant Renger.

Ranne B. Miller, Miller, Stratvert, Torgerson & Schlenker, P.A., Nicholas Pica, Campbell, Pica, Olson & Seegmiller, Albuquerque, NM, for defendant ASA.

D. James Sorenson, Sorenson & Rhoades, Albuquerque, NM, for defendant SJH.

### MEMORANDUM OPINION

HANSEN, District Judge.

**THIS MATTER** is before the Court on Defendants' (Hartmut Renger and Anesthesia Specialists of Albuquerque, hereinafter "Defendants") Motion for Partial Summary Judgment Dismissing Defamation Claim (Docket No. 179) and on Defendants' (Hartmut Renger, Anesthesia Specialists of Albuquerque, and St. Joseph's Healthcare Corp.) Motion for Partial Summary Judgment Dismissing Plaintiff's Tortious Interference Claim (Docket No. 175), both filed on February 18, 1992. Having reviewed the memoranda of the parties and their exhibits, and

being fully apprised of the applicable law, the Court **FINDS** that Defendants' motion on the defamation claim is not well taken and should be denied, and that Defendants' motion on the tortious interference claim shall be granted as to Defendant St. Joseph's Healthcare Corp., but shall be denied as to Hartmut Renger and Anesthesia Specialists of Albuquerque.

### Standard for Summary Judgment

Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' ... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celetex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Rule 56 of the Federal Rules of Civil Procedure provides that it is the movant's burden to demonstrate the absence of a genuine issue of material fact. *Id.* at 321–323, 106 S.Ct. at 2551–52. Upon such a showing,

[The] adverse party may not rest upon the mere allegations or denials of the [movant's] pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

Rule 56 further requires that

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

Fed.R.Civ.P. 56(e).

### I. Motion for Partial Summary Judgment Dismissing Defamation Claim

Defendants have moved for summary judgment as to Count V of Plaintiff's six-count complaint. This claim asserts that Dr. Renger communicated with certain of Dr. Leyba's anesthesia residency supervisors and others and made false statements of fact concerning Dr. Leyba. In their motion for summary judgment, Defendants assert that there is no factual basis for a defamation claim and that Dr. Renger is entitled to qualified immunity under the New Mexico Review Organization Act.

### A. The Defamation Claim

■ The elements of a defamation action are as follows: 1) a defamatory communication; 2) published by the defendant; 3) to a third person; 4) of an asserted fact; 5) of and concerning the plaintiff; and, 6) proximately causing actual injury to the plaintiff. *Newberry v. Allied Stores, Inc.,* 108 N.M. 424, 429, 773 P.2d 1231 (1989).

A statement is deemed to be defamatory per se, if, without reference to extrinsic evidence and viewed in its plain and obvious meaning, the statement imputes to plaintiff ... unfitness to perform duties of office or employment for profit, or the want of integrity in discharge of the duties of such office or employment; [or] some falsity which prejudices plaintiff in his or her profession or trade....

*Id.* (*citing Marchiondo v. New Mexico State Tribune Co.,* 98 N.M. 282, 287–88, 648 P.2d 321, *cert. quashed,* 98 N.M. 336, 648 P.2d 794 (1982)).

As for the fourth element listed above, "[w]hether a publication constitutes opinion or fact ... 'depends upon whether ordinary persons hearing * * * the matter complained of would be likely to understand it as an expression of the speaker's * * * opinion, or as a statement of existing fact.'" *Id.* 108 N.M. at 430, 773 P.2d 1231 (*citing Marchion-*

*do,* 98 N.M. at 404, 648 P.2d 794). "A publication is not defamatory 'merely because the opinion may be expressed in terms of strong invectives, profanity, or sarcastic language.' " *Id.* (*citing Marchiondo,* 98 N.M. at 292, 648 P.2d 321).

> Words, written or spoken, which impute to a physician a general want of professional knowledge or skill, are actionable per se.... Thus, it is actionable per se to charge generally a want of professional ability and integrity, malpractice, gross negligence in diagnosis, or gross misconduct, which is such as to imply that the plaintiff is unfit to practice his profession.

50 Am.Jur.2d *Libel and Slander* § 124 at 125 (1970).

Plaintiff alleges that he was defamed when Dr. Renger phoned several individuals and made false "statements of fact" to them concerning Dr. Leyba. Leyba contends that "these communications tended to and did, in fact, expose Dr. Leyba to contempt, harmed his reputation and discouraged others from associating or dealing with him." (Complaint ¶ 56.)

Although Plaintiff has named several people as having had defamatory remarks published to them, only a "Dr. Lewis," when being deposed, was able to recall any alleged defamatory remarks. Having reviewed the transcript of Dr. Lewis' deposition, I have identified five instances of alleged defamation.

■ The first statement attributed to Dr. Renger is that Dr. Leyba "seemed to set himself up as an expert in pediatric anesthesia." (Lewis Dep. at 7.) This statement, coupled with the later statement by Dr. Renger that implied that Dr. Leyba "is not what he says he is," indicates that Dr. Leyba is falsely holding himself out or representing himself as an expert in a particular field. I conclude that this is a statement of an existing fact, not an opinion, and one which can be proved or disproved. In its essence, the communication tends to indicate that Dr. Leyba has been misrepresenting his qualifications.

■ The second statement attributed to Dr. Renger is that "Leyba did not have the full support of the men in the anesthesia group." (Lewis Dep. at 7.) This statement seems to have elements of both opinion and fact. It is also vague as to what the "anesthesia group" is. Clearly, it could have been Dr. Renger's opinion that Dr. Leyba did not have everyone's support at Anesthesia Specialists of Albuquerque ("ASA"). Then, too, as a member of the ASA anesthesia group, the fact that Dr. Renger himself did not support Leyba, would tend to prove the statement to be truthful.

In any event, it is a vague statement, and because it has elements of both fact and opinion, and because it does not specifically touch upon Dr. Leyba's credentials or skill as a doctor, I conclude that it does not rise to the level of a defamatory statement.

■ The third alleged defamatory statement made to Dr. Lewis is that Dr. Renger "did not speak highly of Leyba as an anesthesiologist." (Lewis Dep. at 9.) This response was elicited as a result of being asked, "Did that doctor tell you anything about *his opinion* about what Dr. Leyba's reputation in the community was as an anesthesiologist?" As is made clear by the body of the question itself, the speaker was giving his own opinion about Leyba's reputation as an anesthesiologist. And as the answer indicates, Renger simply did not speak "highly" of Leyba as an anesthesiologist. I conclude that this statement is not defamatory.

■ The fourth statement came in response when Dr. Lewis was asked about whether Dr. Renger gave any impression as to what Dr. Leyba's reputation was in the community as an anesthesiologist. This is a different question, and the answer—that Dr. Leyba has a poor reputation in the community as an anesthesiologist—supports a claim for defamation. (Lewis Dep. at 9.)

■ Finally, the defendant allegedly told Dr. Lewis that Dr. Leyba "didn't meet the standard that he thought that he should have." (Lewis Dep. 9.) This statement was also in response to the question about Leyba's reputation in the community. The communication is that one doctor is saying that he feels that another doctor does not meet

the requisite standard in the profession. This too supports a claim for defamation.

The second element of a claim of defamation is that the plaintiff must prove that *the defendant* made the defamatory statement. In the case of Dr. Lewis (the only person who can remember the substance of his telephone call concerning Leyba) Defendants contend that Plaintiff cannot prove that it was Dr. Renger who made those statements.

As is certainly clear from Dr. Lewis' deposition, he cannot remember the name of the doctor who called him concerning Dr. Leyba. He does remember that it was a doctor from Albuquerque. He is not familiar with the name "Renger." Based upon Dr. Lewis' lack of memory, and lack of ability to identify the caller by name, Defendants contend that they are entitled to summary judgment.

In his deposition, however, Dr. Renger freely admits that he called Dr. Lewis. Noting that on a motion for summary judgment, any reasonable inference drawn from the facts are to be in the non-movant's favor, there is a strong inference that the doctor who called Dr. Lewis and made the statements was Dr. Renger. There was no evidence presented that Dr. Renger denies having communicated the substance of the Lewis telephone call. In fact, Renger admits that he did talk with Dr. Lewis, and, if in fact he did make those communications concerning Leyba, Renger said he would have expressed his reservations about Leyba's training background and would have told Lewis that there were a few physicians who said that they would prefer not to work with Leyba.

Upon these facts, and the reasonable inferences which can be drawn therefrom, there is a genuine issue of material fact as to whether Renger defamed Dr. Leyba when he called Dr. Lewis.

Plaintiff also claims that Dr. Renger made defamatory statements to Dr. Kirby. Based upon the fact that Dr. Kirby has no memory of any specific statements made by the Albu-querque anesthesiologist who called him on the telephone, and because Dr. Renger has not admitted having made any specific defamatory statements to Dr. Kirby, there is no genuine issue of material fact on whether Renger made any defamatory statements to Kirby.

### B. *The New Mexico Review Organization Immunity Act (NMROIA)*

Defendants next contend that even if there is a triable issue of material fact regarding defamation, Defendant Renger is entitled to qualified immunity under the NMROIA because there is a lack of clear and convincing evidence of malice on the part of Renger. A discussion of the NMROIA necessarily involves two inquiries: 1) is the NMROIA applicable to Renger in this instance; and, 2) does the non-movant present enough evidence to show malice?

■ New Mexico Statutes Annotated, Sections 41–9–3 and 41–9–4 specify a limitation on liability under certain circumstances for individuals involved in hospital peer review. Section 41–9–3 provides limited liability to "person[s] providing information to a review organization ... unless such information is false and the person providing such information knew or had reason to believe such information was false."[1] The plain language of this section is clear. In order to assert the protection of Section 41–9–3, an individual *must be providing information to the review organization.*

In this case, the facts are not disputed that the alleged defamatory statements were made during conversations with individuals who were not members of the review organization. Section 41–9–3 does not apply to Dr. Renger.

■ Section 41–9–4 pertains to the limitation on liability for *members* of a review organization. Specifically, that section provides limited liability to a "person who is a

---

1. The NMROIA defines a "review organization" to include "an organization whose membership is limited to health care providers and staff ... and which is established by a health care provider which is a hospital ... for the purposes of ... determining whether a health care provider shall be granted authority to provide health care services using the health care provider's facilities or whether a health care provider's privileges should be limited, suspended or revoked." NMSA 1978 § 41–9–2(E)(8) (1989 Repl.Pamp.).

member or employee of, who acts in an advisory capacity to or who furnishes counsel or services to a review organization." Furthermore, that section shields a person from liability as a result of

[T]he performance of the person of any duty, function or activity as a member of a review organization or by reason of any recommendation or action of the review organization when the person acts in the reasonable belief that the person's action or recommendation is warranted by facts known to the person or the review organization after reasonable efforts to ascertain the facts upon which the review organization's action or recommendation is made.

Under Section 41-9-4, liability for statements is limited to those motivated by malice.

As that section makes clear, it applies to a person who is either a member of or an employee of the review organization, or a person who acts in an advisory capacity to or furnishes counsel or services to the review organization.

According to Defendants, "Dr. Renger conducted his investigation of Dr. Leyba's credentials at the request of the doctors at St. Joseph responsible for credentialing matters and the communications about Dr. Leyba at issue occurred in the fulfillment of that duty." (Defendants' Memorandum Brief on Defamation at 14.)

Defendants' Statement of Undisputed Fact No. 9 states that:

At all relevant times, Dr. Renger was the chief of anesthesia and a member of the executive committees at all three St. Joseph's hospitals. In that capacity, Dr. Renger was asked by Dr. Floyd (the Medical Director at St. Joseph's) and the Chairmen of the Credentialing Committees at each of the three St. Joseph hospitals (Drs. Duncan, Savino, and Oberdorfer) to review and investigate Dr. Leyba's application for credentials. Dr. Floyd and the Credentialing Committee Chairmen sought Dr. Renger's assistance in contacting the doctors who had supervised Dr. Leyba in his training programs. Dr. Renger testified in his deposition that 'I was asked by them [Credentialing Committee Chairmen] to get involved.'

To contradict the factual statement regarding Renger's membership on all three executive committees, Plaintiff has cited to St. Joseph's answers to interrogatories which indicate that Dr. Renger was only a member of the Executive Committee at the downtown St. Joseph's hospital.

Plaintiff cites to the deposition of Dr. Duncan, Chairman of the St. Joseph Credentials Committee, who stated that prior to the committee meeting on Dr. Leyba, he did not remember discussing the application with any members of the committee, nor with Dr. Renger.

Dr. Savino has stated that he did not personally, nor did anyone on his committee, ask Dr. Renger to do anything on behalf of the committee. The fact asserted by Renger, that the Chairmen of the Credentialing Committees asked for Renger's assistance, seems amply disputed by the record.

From the record, it is not clear exactly how or why Dr. Renger got involved in doing a background check on Dr. Leyba. Based upon the above facts, it seems undisputed that Dr. Renger was neither a member nor an employee of the review organization. The real dispute is whether Renger was acting in an advisory capacity or furnished counsel or services to the review organization. As to this issue there appear to be sufficient disputed facts as to Renger's role to create a genuine issue of material fact. Hence, Defendants are not entitled to summary judgment on the issue of whether the NMROIA applies to Dr. Renger.

Even if the NMROIA were found to be applicable to Renger, he would still only be entitled to its protections if he was acting without malice and in the reasonable belief that his actions or recommendations were warranted by facts known to him or to the review organization, after reasonable efforts to ascertain the facts upon which the review organization's action or recommendation was made. Defendants contend that there is a lack of clear and convincing evidence of malice on the part of Dr. Renger.

To establish malice, Plaintiff must show that Dr. Renger's statements to Dr. Lewis were made with knowledge that the statements were false or with reckless disregard of whether they were false or not. *Saenz v. Morris,* 106 N.M. 530, 532, 746 P.2d 159 (Ct.App.1987). It is not enough for Plaintiff to show ill will on the part of Dr. Renger. *McNutt v. New Mexico State Tribune,* 88 N.M. 162, 168, 538 P.2d 804 (Ct.App. 1975).

As for proving that Dr. Renger acted with reckless disregard of the truth, Plaintiff must put forth sufficient evidence that Defendant in fact entertained serious doubts as to the truth of the statements he made. N.M.U.J.I. 13–1009.

On the issue of malice, Plaintiff has put forth sufficient facts which show that there is a genuine issue of material fact as to whether Dr. Renger acted with malice when he contacted Dr. Leyba and others, and when he reported to the credentials committee. This Court has already ruled as such in its October 18, 1991, order. Moreover, Plaintiff has put forth facts which show that in addition to the written negative comments which Renger solicited from various doctors, when he learned of positive recommendations for Dr. Leyba, he did not seek written comments nor did he present them to the credentialing committee. Specifically, Renger testified that a "Dr. D'Angelo" (Leyba's supervisor at Heights) gave a positive recommendation, but that Renger did not feel it necessary to get it in writing. When asked why he didn't get a letter of evaluation from D'Angelo, Renger responded that it, "was sufficient for me. His was positive. No problem." When again asked why he didn't get the positive recommendation in writing, he stated, "Why should I? It's up to me what I want in writing and what I don't."

Even if Dr. Renger was acting in an advisory capacity to the review organization, his campaign of seeking allegedly negative evaluations of Leyba and his apparently selective presentation of negative comments and withholding of positive recommendations creates a genuine issue of material fact as to whether his actions were motivated by malice.

Based upon the above, Defendants motion for partial summary judgment on the defamation claim (Count V) shall be denied.

## II. *Motion for Partial Summary Judgment Dismissing Plaintiff's Tortious Interference Claim*

With regard to this motion, Defendants Dr. Renger, ASA, and St. Joseph's Healthcare Corporation ("St. Joseph's") seek to dismiss Plaintiff's tortious interference claim (Count IV). Count IV states that Dr. Renger, St. Joseph's, and ASA conducted activities against Dr. Leyba with an "intent to interfere with existing or prospective contractual relations." (Complaint ¶ 52.) Plaintiff further alleges that these defendants' actions were animated by "improper motives" and they "employed improper means to accomplish their end." (Complaint ¶ 53.)

In their motion for summary judgment, defendants make the following two arguments: (1) that there is no evidence of interference with any actual or prospective contractual relation, and, (2) that because the alleged defamatory statements are the supposed cause of the interference, and because Dr. Renger is entitled to immunity under the NMROIA, there is no cause of action. I shall address these arguments in reverse order.

### A. *Application of the NMROIA to the Tortious Interference Claim*

Defendants contend that Dr. Leyba bases his tortious interference claims against Dr. Renger on the same communications which underlie the defamation claim. Hence, they argue that summary judgment is appropriate because Dr. Leyba can prove no defamatory statements and, because even if defamation were shown, the NMROIA would grant Renger immunity. As noted above, I conclude that there is a genuine issue of material fact as to the defamatory statements and as to whether Renger is able to avail himself of the protections of the NMROIA. For this reason, defendants are not entitled to summary judgment, on the basis of the NMROIA.

## B. *Actual or Prospective Contractual Relations*

The main thrust of Defendants' motion is that Plaintiff "can point to no actual or prospective contractual relations harmed by any actions of the Defendants." (Defendants' Memorandum on Tortious Interference at 1.)

■ The tort of interference with existing or prospective contractual relations requires proof of: 1) a contract or prospective contractual relation; 2) defendant's knowledge of the contractual relation; 3) intentional and improper interference, which means either (a) improper motive solely to harm plaintiff, or (b) an improper means; and, 4) pecuniary harm cause by the interference. *Clough v. Adventist Health Systems, Inc.*, 108 N.M. 801, 806, 780 P.2d 627 (1989).

Plaintiff asserts that Dr. Renger, individually, and as managing partner for ASA, interfered with and subverted the credentialing process at St. Joseph's. This was accomplished by Renger having made false and defamatory statements concerning Leyba in order to procure negative recommendations. Plaintiff also asserts that Renger, and ASA through Renger, conspired with St. Joseph's to exclude osteopathic anesthesiologists from practicing at the St. Joseph's hospitals, thereby disrupting Dr. Leyba's business relationships with his patients and virtually destroying his practice in the Albuquerque area.

■ In essence, Leyba asserts two areas of "contracts"—his privileges at the merged St. Joseph's/Heights hospital and his prospective relations with patients. With regard to prospective or actual relations with patients, however, Leyba has put forth absolutely no facts which would establish such relations. He simply makes bare allegations that his practice has suffered. Hence, with regard to Dr. Leyba's doctor/patient relations, he has not met his burden to come forward with sufficient evidence to defeat summary judgment. Leyba's claims for interference with prospective relations with patients is, therefore, dismissed. The remaining area is his relation with St. Joseph's/Heights.

■ Plaintiff's facts relating to his privileges to practice are as follows: Dr. Leyba, prior to becoming an anesthesiologist, was a general family practitioner. As a family practitioner, Dr. Leyba was granted staff privileges at St. Joseph's Hospital from 1975 until 1983, when he requested and was granted a leave of absence in order to participate in a two-year anesthesiology residency program. During that same time period, Leyba also had privileges in family practice at Heights General Hospital. Then, from 1983 until 1985, Leyba participated in the two-year osteopathic residency program in anesthesiology at Heights, under the supervision of Dr. D'Angelo. This program had a component whereby Leyba also did three two-month residency rotations at other hospitals. Once he successfully completed the residency, he applied for and was granted privileges at Heights in anesthesiology and family practice. From then on, it appears that he was basically practicing anesthesiology.

Some time in the fall of 1987, it became known that St. Joseph's intended to acquire the Heights Hospital and the Heights physicians were told that they would have to be recredentialed. In addition, the Heights osteopathic anesthesiologists were informed of ASA's exclusive contract with St. Joseph's and of the real possibility that the contract would be extended to cover the Heights hospital, once acquired. The osteopaths became concerned because it appeared that in order for them to continue practicing, they would not only have to be recredentialed, but would have to be accepted into the ASA group, which was a group of allopathic physicians.

According to a letter written by Dr. Stephen Margel, one of the osteopathic anesthesiologists at Heights, Dr. Margel met with Dr. Renger, then managing partner of ASA, on December 1, 1987. At that meeting, Dr. Renger informed Dr. Margel that even though he [Margel] was board certified and had more experience than some of the ASA group members, he would have to enter the group at the lowest level—if he was even invited to join ASA. Dr. Margel was also told that for the privilege of working in ASA, he would have to give the group 50 percent

of his earnings for the first year. This information was passed along to the other osteopathic anesthesiologists at Heights.

On December 3, 1987, Drs. Margel, Leyba and Langford (all osteopaths) met with Dr. Renger to discuss the matter of the exclusive agreement. At that meeting, Dr. Renger apparently told the osteopaths that they had two options: 1) if the osteopaths were even invited to join ASA, they would have to enter at the bottom level and agree to pay the 50 percent buy in, or 2) they could get their resumes together and look for another job. According to Dr. Margel, Renger stated that even if these doctors were granted staff privileges at the newly-merged hospital, "I will control the scheduling and I won't allow you to have any cases." (This was at a time when Renger had not yet begun an assessment of these doctors' skills.)

Dr. Leyba apparently got very upset at that meeting and said that he had already paid his dues and that he'd rather hire a lawyer than pay the 50 percent.

By letter dated December 21, 1987, the president of St. Joseph's wrote to Renger, Margel, Leyba, and Langford. In that letter, he informed all parties that St. Joseph's had decided to extend the ASA exclusive contract to the newly-merged hospital, *provided* that ASA meets the following two conditions:

1. That it cooperate fully in arranging observations and supervision time in setting up a protocol with the [credentials committees] to evaluate, on a fair, impartial, and reasonably expedient basis, the technical proficiency of Doctors Langford, Margel, and Leyba; and

2. That these physicians, assuming that the requirements of paragraph one with respect to professional competence have been satisfied, be offered full membership in ASA on terms that are reasonable and which reflect their many years of service. At a minimum, these terms must include a waiver of the 50% first year buy-in requirement.

With regard to the above requirements, the president of St. Joseph's explained at his deposition that he intended to convey the message that if Doctors Margel, Leyba and Langford met the baseline level of competence at which a practitioner could be safely admitted to practice, and even if ASA had been recruiting doctors at a higher level, he expected that ASA would accept the three doctors. Moreover, he stated that if the three doctors were credentialed at St. Joseph's then they would meet the baseline level of competence.

At some point in time, ASA met with Dr. Langford and learned that he basically was not interested in working for ASA and that he intended to leave town, which he did soon thereafter. As for Dr. Margel, who had allopathic training, he was granted staff privileges at St. Joseph's and accepted into ASA. The problem was with Dr. Leyba.

In summary, it appears that prior to and but for St. Joseph's taking over Heights, Leyba had a thriving practice at Heights and expected to continue his staff privileges there.

Plaintiff claims that Dr. Renger got involved in the credentials process and, upon his own initiative, contacted physicians at three out-of-state hospitals, at which Dr. Leyba had trained as part of his two-year anesthesiology residency. Plaintiff claims that Renger phoned these individuals and, instead of just asking for their evaluation of Dr. Leyba, Renger made defamatory statements to them, in an attempt to elicit negative comments about Leyba, so that Leyba would be denied privileges. Leyba maintains that Renger had improper, anti-competitive motivations in that he sought to prevent Leyba from being credentialed so ASA would not have to accept him into the group.

Plaintiff contends, therefore, that "Dr. Renger induced and otherwise caused St. Joseph to discontinue its relation with Dr. Leyba, which in turn destroyed Dr. Leyba's relations with his patients." (Plaintiff's Memorandum on Tortious Interference at 4.)

Again, what exactly transpired and why Dr. Renger got involved in the credentialing process is not clear. What is clear is that Renger did in fact telephone several physicians associated with the three outside residency programs in which Leyba participated

and solicited their remarks regarding Dr. Renger.

Because of the exclusive agreement between ASA and St. Joseph's, ASA was to provide services to all three of the St. Joseph's hospitals. Hence, as an anesthesiologist in the ASA group, a doctor would have to be credentialed at all three hospitals. In December of 1987, Dr. Leyba submitted an application to be credentialed at the St. Joseph hospitals.

Again, Dr. Leyba has put forth sufficient evidence to create a genuine issue of material fact as to whether Renger defamed Leyba when he contacted Dr. Lewis at Children's Hospital of Los Angeles. Similarly, the contacts Renger made with the other doctors associated with the outside residency programs, can also be used to establish whether Renger intentionally interfered with Leyba's relationship with Heights hospital and the St. Joseph's hospitals.

With regard to Dr. Lewis, on February 11, 1988, he wrote to the Chairman of the Credentials Committee at the downtown St. Joseph's hospital with regard to Leyba's residency program in anesthesiology. In that letter Lewis states:

> While at our institution, Dr. Leyba performed approximately 120–150 anesthetics in pediatric surgical patients. Early on, it was apparent that Dr. Leyba did not possess the skills and knowledge of other residents with the comparable level of training. Consequently, we did not feel free to assign him to a large number of infants and high risk surgical patients. Also, he did not undertake any duties in either the pediatric or neonatal I.C.U.
>
> On a scale of 1 to 10, his overall evaluation by my staff was about a 4, and none of us would want to work with him in an anesthesia practice.
>
> Obviously, we do not feel him to be an expert in pediatric anesthesiology.

At his deposition, Dr. Lewis was asked about the letter that he had submitted to the credentials committee, at the behest of Dr. Renger. The substance of Dr. Renger's comments to Dr. Lewis are outlined above in the discussion on defamation.

Later on, by letter dated May 10, 1988 (after Leyba had already been denied privileges), Dr. Lewis stated, "The 2/11/88 letter regarding Dr. Lawrence Leyba should be disregarded, and the report of 8/5/85 should be used as my evaluation of Dr. Leyba's capabilities." That "report" was an evaluation of Dr. Leyba which was completed contemporaneously with Dr. Leyba's residency at Children's Hospital. The evaluation, signed by Dr. Lewis, rated Leyba on a number of criteria. The overall evaluation of Leyba was that he was "effective and competent—satisfactorily meets the stated objectives." It said his technical skills were commensurate with his level of training. Under "comments" it was written: "overall average resident. Very pleasant, cooperative. Receptive to teaching."

In any event, when the credentials committees first met in February of 1988 to address Dr. Leyba's application, they had Dr. Lewis' negative letter but did not yet have the letter from Dr. Kirby from another residency rotation in Texas. The minutes from the various credentials committees meetings indicate that they addressed Dr. Leyba's application for privileges but that because certain evaluations had not yet been received, Dr. Leyba's application would be tabled until the record was complete.

During the month of March, the credentials committees received a negative letter from Dr. Kirby. The letter was not included as an exhibit to the record, but there are excerpts of the letter here and there, and it is clear that Leyba got a poor evaluation from Kirby.

In March, the credentials committees met and again addressed Dr. Leyba's application. The St. Joseph's downtown committee voted to deny Dr. Leyba's application "based on inadequate training **and adverse letters of recommendation from the directors of the three, two-month programs as they relate to specialty training in anesthesiology.**" (Emphasis supplied). St. Joseph's West Mesa and St. Joseph's Heights hospitals also voted to deny Dr. Leyba privileges in March.

In June, St. Joseph's Heights' credentialing committee met to reconsider Dr. Leyba's

request for privileges. At this meeting, the committee addressed the letter from Dr. Lewis which in effect retracted his earlier negative letter of February 11, 1988. They also addressed the fact that Dr. Kirby's letter of March 10, 1988, was contradicted by a letter from Dr. Abston, who also supervised Dr. Leyba in Texas. Following this meeting, Dr. Leyba was granted staff privileges in anesthesiology, with some restrictions, at the Heights hospital.

The St. Joseph's West Mesa credentials committee met on June 30, 1988, to address additional information it had received regarding Dr. Leyba. Dr. Leyba was then granted privileges, with limitations.

St. Joseph's downtown committee also met in June, but, after reviewing additional materials received on Dr. Leyba, they voted once again to deny him privileges. It was not until November of 1988 that the downtown committee met and finally approved privileges for Dr. Leyba, with certain limitations.

In summary, the evidence submitted by Leyba indicates as follows: 1) Leyba had staff privileges at Heights, and there was no indication that such privileges would not be continued; 2) St. Joseph's was to take over Heights and extend the ASA exclusive agreement; 3) St. Joseph's told Renger and ASA that a condition of extending the ASA contract to Heights was that if Leyba were granted privileges at St. Joseph's, then ASA would have to take him in; 4) Renger got involved in the credentialing process, although it is not clear how or why; 5) Renger contacted at least three physicians at the outside rotations; 6) Renger made negative comments to at least Dr. Lewis; 7) Dr. Lewis wrote a negative letter; and, 8) at the March 15 and 16, 1988, meetings of the three credentials committees, Dr. Leyba was denied staff privileges, based in part on the negative letters.

Based upon the above facts, as put forth by Leyba, I conclude that Plaintiff has sufficiently created a genuine issue of material fact as to whether he had an expectation of continued relations with the hospital and whether Renger and ASA improperly interfered with that relation. St. Joseph's itself, as the other entity in the relation, was not a third party and cannot be liable in tort for interfering with its own relations with others. Also, there is no evidence put forth by Leyba that St. Joseph's conspired with anyone to prevent the osteopathic anesthesiologists from becoming credentialed at the hospital.

In light of the above, partial summary judgment shall be granted in favor of St. Joseph's on Count IV, and shall be denied as to Renger and ASA.

An order in accordance with this memorandum opinion shall be entered.

### ORDER

**THIS MATTER** is before the Court on Defendants' (Hartmut Renger and Anesthesia Specialists of Albuquerque) Motion for Partial Summary Judgment Dismissing Defamation Claim (Docket No. 179) and on Defendants' (Hartmut Renger, Anesthesia Specialists of Albuquerque, and St. Joseph's Healthcare Corp.) Motion for Partial Summary Judgment Dismissing Plaintiff's Tortious Interference Claim (Docket No. 175), both filed on February 18, 1992.

Having reviewed the memoranda of the parties and their exhibits, and being fully apprised of the applicable law, and having entered its memorandum opinion contemporaneously herewith, the Court **FINDS** that Defendants' motion on the defamation claim is not well taken and should be denied, and that Defendants' motion on the tortious interference claims shall be granted, as to Defendant St. Joseph's Healthcare Corp., but shall be denied as to Defendants Hartmut Renger and Anesthesia Specialists of Albuquerque.

**IT IS, THEREFORE, ORDERED** that Defendants' Motion for Partial Summary Judgment Dismissing Defamation Claim be, and the same hereby is, **denied.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment Dismissing Plaintiff's Tortious Interference Claim be, and the same hereby is, **granted** as to Defendant St. Joseph's Healthcare Corp., and **denied** as to Defendants

Hartmut Renger and Anesthesia Specialists of Albuquerque.